IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | | |
|---|---|---|
| Davon E. McCoy, | ) | Case No. 1:07-CV-198-DCB |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| R. Spidle, et al., | ) | |
| Defendants. | ) | |

On May 6, 2009, this Court issued an Order, granting in part the Defendants' Motion for Summary Judgment and granted Plaintiff one last extension of time to file a Response to all other parts of the Defendants' Motion for Summary Judgment. On May 13, 2009, Plaintiff filed his Response. (Documents 125-128: Opposition.)

On May 28, 2009, Plaintiff renewed his request for sanctions against Defendants, which the Court had denied in the May 6, 2009, Order. (Document 134: Motion to Renew Motion for Sanctions.) Plaintiff also asked the Court to return an original document attached to his Reply in support of his Motion for Production of the deposition transcript. (Document 135: Motion for Substitution of Exhibit.)[1]

On May 29, the Plaintiff filed a Motion to Strike the Defendants' Reply because it was filed on the same day the Reply was due to be filed with the Court. (Document 136: Motion to Strike and Objections.)

---

[1] The only copy of this brief is electronic.

On June 9, 2009, the Defendants filed a Reply and supplemented their Statement of Facts. On July 2, 2009, Plaintiff filed a motion seeking leave to file a supplemental brief and exhibits, a.k.a., a Sur-Reply. (Document 140: Motion to Request Leave to Respond to Defendants, which this Court treats as a Sur-Reply.) The Defendants object, and alternatively seek to respond to Plaintiff's supplemental brief if it is allowed by the Court.

The Court will allow the filing of document 140 as a Sur-Reply to the extent the Plaintiff asserts he is serving a life sentence, which would arguably invalidate this Court's application of *Edwards v. Balisok*[2] to bar his section 1983 due process claim challenging his rules violation (RV) hearing and conviction. The Defendants may file a Sur-Sur-Reply, which shall be limited to supporting their motion for summary judgment as a matter of law under *Balisok*.

The Court denies all the pending motions, including the parts of the Defendants' Motion for Summary Judgment which remained pending after the Court's ruling on May 6, 2009. The Court finds that a settlement conference may be of assistance to the parties

---

[2] In its Order issued on May 6, 2009, the Court granted summary judgment for Defendants on Plaintiff's due process claim related to the rules violation (RV) hearing, explaining that, as a matter of law, it was barred by the favorable termination rule. *Edwards v. Balisok*, 502 U.S. 641 (1997). The Court ruled as a matter of law, assuming if the Plaintiff prevailed on his due process claim it would necessarily require a return of good time credits, which would result in a sentence reduction. The Court noted that if it erred in this conclusion, it would reassess its ruling. (Order (document 123) at p.12 n. 2.) Defendants assert that the Court should affirm its summary judgment for Defendants based on *Balisok* because Plaintiff admits he lost 180 days of good time credit. Plaintiff, however, asserts he is serving a life sentence. (Sur-Reply at 2.) This Court ruled as a matter of law in respect to *Bolisok*. It did not make any findings that factually Plaintiff's circumstances fit within the confines of *Bolisok,* but assumed the Defendants would not urge it, if factually the bar was not appropriate. The state bears the burden to establish that if Plaintiff prevails here on his due process claim, it would necessarily shorten the length of his confinement. *Ramirez v. Galaza*, 334 F.3d 850, 859 (9th Cir. 2003). The Court will allow the Defendants to respond to Plaintiff's Sur-Reply.

and refers the case to the Clerk of the Court for assignment to a settlement judge. In the event the case does not settle, the case shall be set for trial.

## Background

The Plaintiff alleged a claim for damages under 42 U.S.C. § 1983 against Defendants Spidle, Doyle, Perry, Dreith, Dangler, Watson, Sumaya, Allen, Stockman, Buckley and Garza violated his due process rights in a rules violation hearing on June 15, 2005, which resulted in his conviction for conspiracy to murder police officers and his confinement in a security housing unit (SHU). Plaintiff alleged that Defendant Dangler retaliated against him by reissuing a decision to deny his appeal of the RV after it had first been granted. Plaintiff alleges that while housed at SHU he suffered a seizure, passed out, fell and dislocated his shoulder. Thereafter, Defendants Tomlin, Kee, Garcia, Rubacalaba, Poblete, Reyes, Reynoso, Campos, Gonzales, and Morales, were deliberately indifferent to his medical needs in violation of the Eighth Amendment to the United States Constitution.

"In its Order issued on May 6, 2009, the Court granted summary judgment for Defendants on Plaintiff's due process claim related to the rules violation hearing, explaining that, as a matter of law, his claim under section 1983 was barred by the favorable termination rule. *Edwards v. Balisok*, 502 U.S. 641 (1997)." *Supra* n.2. The Plaintiff's claims remain against Defendant Dangler for retaliation and for deliberate indifference against Tomlin, Kee, Garcia, Rubacalaba, Poblete, Reyes, Reynoso, Campos, Gonzales, and Morales.

## Retaliation Claim Against Defendant Dangler

The due process clause of the Fourteenth Amendment creates "no legitimate claim of entitlement to a [prison] grievance procedure." *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988). Even the failure of officials to properly implement an administrative appeals process within the prison system does not raise constitutional concerns. *Id.*; *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). There is, however, a First

Amendment right of access to the courts, which hinges on his ability to access the prison grievance system, *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995); *see also*, *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (First Amendment right to file prison grievances and pursue civil rights litigation in the courts).

To prevail here, Plaintiff must prove that Defendant Dangler retaliated against him for exercising his First Amendment right to file prison grievances and to pursue civil rights litigation in the courts. Plaintiff must show: 1) that Defendant Dangler took some adverse action against him; 2) because Plaintiff exercised a constitutional right; 3) Dangler's action chilled Plaintiff's exercise of his constitutional rights, and 4) Dangler's action did not reasonably advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567-68. Plaintiff must establish a nexus between Dangler's actions and Plaintiff's protected activity. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000).

Defendant Dangler attests that from May 2, 2005, to February 6, 2007, he was one of two appeals coordinators at High Desert State Prison (HDSP). The appeals coordinator is responsible for screening inmate appeals for compliance with regulations, coordinating their processing, and maintaining the appeal records. If an appeal is screened out, it is returned to the inmate without processing. The appeals coordinator does not keep a record of it. A review of grievances/appeals submitted by the Plaintiff at HDSP between May 2, 2005, and February 6, 2007, reflects that only one grievance/appeal was not screened out. Appeal HDSP-05-03578, concerning McCoy's July 17, 2005, appeal of the RV finding him guilty of conspiracy to murder peace officers was not screened out. All others were terminated by screening. (Document 138: Supplemental SOF, Ex.AA: Dangler Decl.)

There is evidence in the record that on September 12, 2005, the Appeals Branch in Sacramento, California, received a letter from Plaintiff complaining that the Appeals

Coordinator, "CO Wagner, or something to that effect,"[3] was stating frivolous reasons via screening sheets as to why he would not process Plaintiff's appeal concerning the guilty finding for conspiracy to murder police officers.  Plaintiff complained, the reasons for not processing the appeal are "stupid and dumbfounded" and the appeals coordinator is "playing games."  (Plaintiff's Response, SOF, Ex. O: Letter of 9/6/2005.)  On October 3, 2005, Plaintiff again wrote the Sacramento, Appeals Branch, imploring someone to please find his appeal.  *Id.* at Letter of 10/3/2005.  On October 19 and November 2, 2005, Plaintiff was told that he needed to proceed through the second level appeal first before contacting the Director, and he needed to contact the Appeals Coordinator.  *Id.* at Letter of 10/19/2005; Letter of 11/2/2005.  On November 3, 2005, the Appeals Coordinator at Corcoran responded to the Plaintiff, informing him that he needed to comply with the screening directives from the Appeals Coordinator at HDSP, who was Defendant Dangler.  *Id.* at Letter of 11/3/2005.  All roads led the Plaintiff back to Defendant Dangler.

    Screening directives had been issued by Defendant Dangler on July 28, 2005, because Plaintiff's appeal included excessive verbiage and voluminous unrelated documentation.  He was told to remove the Rules Violation Report (RVR) log # FC-05–5-0012 and resubmit the appeal.  Arguably, the Plaintiff had complied with this directive because on November 15, 2005, Defendant Dangler wrote a note and signed a second screening form apologizing for missing the Plaintiff's request to remove the RVR log "for the second time." *Id.* Ex. R.

---

    [3] Defendant Dangler attests that he was one of two appeals coordinators. The other being CO S. Babich. (Document 138: Supplemental SOF, Ex.AA: Dangler Decl. at ¶ 2.) The Court finds that the name Dangler was more likely to be misconstrued as Wagner than the name Babich.

On January 25, 2006, the Chief Deputy Warden (A), D.K. Sisto,[4] issued the decision granting Plaintiff's appeal in part as to Plaintiff's claim that the conspiracy to murder police officers was unsupported by the evidence. The Court refers to this as Decision One. (Ds' MSJ, SOF, Ex. I.) Decision One contains the following pertinent paragraphs:

> The inmate's allegation that the guilty finding is unreliable based on the evidence is supported. The RVR report states that McCoy was an alleged co-conspirator with fellow Crip and Blood disruptive group members who were conspiring to murder Peace Officers. This information is based on information from confidential memorandums dated 1/26/05 by M. Minnick, 2/25/05 by R. Marquez, and 5/2/05 by D. Dittman. The RVR was heard by the SHO on 6/15/05. Inmate McCoy was found guilty of Conspiracy to Murder Peace Officers and was assessed 180 days forfeiture of credits consistent with a Division A-2 offense. The SHO reviewed all of the above mentioned confidential memorandums along with the RVR in the preponderance of guilt.
>
> **Upon review of the confidential memorandums listed above, McCoy is not mentioned in memorandums dated 1/26/05 and 2/25/05. The memorandum dated 5/2/05 states that he was aware of the plan to murder Peace Officers. However, there is no supporting documentation to demonstrate that he was involved in the planning of the assaults. Additionally, there is no proof such as a date, time, or place that states he was involved in the alleged planning of the conspiracy. The information suggests that he knew of the planned assault but does not support the allegation that he was an active conspirator**.

(MSJ, SOF, Ex. I: Decision One at 3-4) (emphasis added). The Chief Deputy Warden directed that a Modified Order be generated by the HDSP Appeals Office instructing the Disciplinary Officer to dismiss RVR[5] Log # C-05-05-017 dated 5/2/2005. *Id.* at 4. The remainder of the Plaintiff's appeal was denied as it related to the alleged RV due process violations. *Id.*

---

[4] Decision One, was signed for Chief Deputy Warden (A), D.K. Sisto by someone, whose signature the court can not read.

[5] Rule Violation Review.

- 6 -

As the Court noted in its May 6, 2009, Order,[6] the Inmate/Parolee Appeal Form filed by the Plaintiff on July 25, 2005, subsection G, Reviewer's Action, was signed by Defendant Dangler as "completed" and marked "granted" on January 25, 2006. The Warden/Superintendent affixed his signature, and the form was date stamped as returned to the inmate on January 27, 2006. *Id.*, Ex. E.

According to Defendant Dangler's memo written to the Corcoran Inmate Appeals Analyst on April 27, 2006, Decision One was mailed on January 25, 2006, to Corcoran where the Plaintiff was being housed in SHU, but within four days, Defendant Dangler determined that the appeal should have been denied. Defendant Dangler immediately contacted Corcoran's appeals office and asked that, upon receipt, they mail the appeal response and Modification Order back to him. He received the appeal decision back from Corcoran on or about February 20, 2006, and "prepared the revised response and it was mailed to [Corcoran] on February 21, 2006." *Id.*, Ex. J: Dangler Memo. The Court refers to the "revised response" as Decision Two.[7] It denied the appeal.

Defendant Dangler also revised the Inmate/Parolee Appeal Form filed by the Plaintiff on July 25, 2005, subsection G, Reviewer's Action, scratching out "granted" and marking it "denied." He did not change his signature date, but changed the date stamp for when it was returned to the inmate from January 27, 2006, to February 21, 2006. *Id.*, Ex. E.

Decision Two was almost identical to Decision One. Decision Two was issued without changing its date or in any other way designating or identifying that it was a revision. Only three changes were made. The first sentence in the above two paragraphs was changed from "the inmate's allegation that the guilty finding is unreliable based on

---

[6] See Document 123: Order at 15.

[7] Decision Two, like Decision One, was issued by Chief Deputy Warden (A), D.K. Sisto, and signed for him by someone, whose signature the court can not read.

- 7 -

the evidence is supported" to "the inmates allegation that the guilty finding is unreliable based on the evidence is not supported." *Id.*, Ex. L: Decision Two at 3 (emphasis added). Decision Two omitted the second paragraph where the Warden concluded that two of the confidential memorandums failed to name the Plaintiff and the third memorandum only suggested he was aware of the conspiracy. Most importantly, Decision Two changed the disposition of the appeal from granted to denied. *Id.* at 3-4.

Even though Defendant Dangler allegedly took action in February to "rectify" the erroneously granted appeal and reinstate the RV, the first decision, Decision One, was placed in Plaintiff's central file and he was released into the general prison population at the beginning of April. By the end of April, it came to Defendant Dangler's attention that Plaintiff was being housed in general population pursuant to Decision One. Defendant Dangler wrote his memo to the Corcoran Appeal's office on April 27, 2006, directing that the Plaintiff be returned to SHU housing. Thereafter, Plaintiff's attempts to appeal Defendant Dangler's decision to change the decision to deny the appeal instead of grant it were screened out by the appeals coordinator at Corcoran as duplicative. (Response, SOF, Ex. M13: screening forms.)

The evidence in the record, construed in Plaintiff's favor, supports a theory of retaliation because it suggests that Defendant Dangler did know about the Plaintiff's complaints to his superiors at the Appeals Branch in Sacramento, which accused him of improperly screening and delaying processing of his appeal. The manner by which Defendant Dangler changed the appeal decision suggests that he was attempting to obliterate or cover-up the first decision without making a record, instead of withdrawing it, explaining the error and reason for changing the decision, and reissuing it. Because there was no record of the change, Plaintiff's attempts to appeal Dangler's decision to change the appeal from "granted" to "denied" were screened out as duplicitous appeals on the merits of the RV hearing and conviction. *Id.* at Ex. M13: July 17, 2006 Screening at the First Level; August 25, 2006 Screening at Second Level. Defendant Dangler's

assertion that the RV was based on some evidence and the denial was based on penological reasons is disputed by the express findings in Decision One that two of the confidential reports failed entirely to mention the Plaintiff and the third suggested only that he knew about the conspiracy but was not an active participant. The Court finds a nexus between Plaintiff's attempt to exercise his right to access the grievance system to appeal the RV decision and the alleged retaliation by Dangler that he improperly and arbitrarily, without any penological reason, changed the appeal decision from granted to denied.

The Court finds that there are material issues of fact in dispute which prevent summary judgement from being granted for Defendant Dangler on the claim of retaliation.

<u>Deliberate Indifference to Plaintiff's Medical Needs.</u>

Prison officials violate an inmate's Eighth Amendment rights under the United States Constitution if they act with deliberate indifference to the serious medical needs of a prisoner. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (overruled on other grounds by *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). A "serious medical need" exists if the failure to treat the prisoner could result in further significant injury or "'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). "Deliberate indifference" requires a showing that a defendant possessed a sufficiently culpable state of mind, *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992); *McKinney v. Anderson,* 959 F.2d 853 (9th Cir. 1992), by acting with a knowing or conscious disregard for the prisoner's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see McGuckin*, 974 F.2d at 1060 ("A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.") Indifference must be substantial; malpractice or even gross negligence does not constitute cruel and unusual punishment. *Estelle*, 429 U.S. at 106.

The medical record compiled by the Plaintiff reflects the following details.

Plaintiff suffers from a seizure disorder, which requires close observation for seizures and routine seizure medication. (P's Response, Ex. O15. He requires housing on a lower bunk because of the seizure disorder and must not work around moving machinery, heights, near hot liquids or surfaces, handle sharp objects, or drive vehicles. *Id.* at Ex. N14. Because of his seizure disorder, the Plaintiff was seen regularly several times during the day by medical staff, medical tech assistants (MTAs), who dispensed his medication. (P's Depo. Transcript at 183.)

On June 5, 2006, a nurse progress note was completed at 22:41 (10:41 p.m.), which reflects the Plaintiff was complaining of "having seizure right now, bone on his left shoulder sticking out; wants to go to Acute Care Hospital." The nurse took his vital signs, which were normal and reported that the Plaintiff was upset, but with clear speech, walking back and forth and writing down the names of prison staff. The ER RN advised to watch the Plaintiff, and refer him for follow-up to the yard RN in the morning on 6/6/06. *Id.* at Ex. V. It is undisputed that Plaintiff had a seizure, fell and dislocated his shoulder. It is also undisputed that the Plaintiff was not seen for follow-up the next morning.

On June 6, 2006, he was seen several times by MTAs for the routine dispensing of his seizure medication. He alleges he told them he needed emergency medical treatment for his dislocated shoulder, but it was not forthcoming. (P's Depo. Transcript at 182-83); (Response, Ex. Q17). Plaintiff completed a health care request form, wherein he reported having had the seizure, having a dislocated shoulder, having not been seen yet"!" He reported a pain scale of "10." The request form was received at 21:00 (9:00 p.m.) on the sixth. It was reviewed by an RN on June 7, 2006, at 7:15 a.m., who marked it "emergency" and at 11:10 a.m. the Plaintiff was transferred to the Acute Care Hospital. *Id.* at X.

Multiple records reflect that Plaintiff was seen at the Acute Care Hospital around 11:00 a.m. on June 7, 2006, with a dislocated left shoulder, which was confirmed by X-ray. *Id.* at Exs. W, Y, Z, B2, R18. He was "admitted so he [could] get general anesthetic with muscle relaxant for reduction of his shoulder dislocation in am by Dr. Smith." *Id.* at Ex. Y.

On June 8, his shoulder was X-rayed again and found to have spontaneously reduced. There was no indication for surgical intervention, and surgery was cancelled. His arm was placed in a sling. He was discharged, and prescribed follow-up in the orthopedic clinic. *Id.* at Ex. Z.

This record disputes Defendants' asserted facts in support of the Motion for Summary Judgment, which are as follows.

Defendants present affidavits from various medical staff named by the Plaintiff in his Complaint, who attest they never saw him or were not involved in any aspect of his care. This proves only that the Plaintiff, like the Court, can not read the signatures of the individuals who signed the various medical records.[8]

---

[8] Defendants Rubalcaba and Reyes attest they were not working in McCoy's building on June 5, 2006, and would not have had any contact with the Plaintiff during the dates alleged in the Complaint. Defendants Tomlin, Kee, and Garcia attest that they never received any call for medical assistance by the time they ended their work shifts at 10p.m. on June 5. Nevertheless, Defendant Poblete noted Defendant Reyes' name on his Nurse's Progress Notes from the night of the seizure. He also noted that "ER RN" advices to watch inmate and follow-up with yard RN at a.m. on 6/6/06. Assuming the "ER RN" was Defendant Reyes, either one or both of these Defendants were arguably responsible for the alleged deliberately indifferent care provided to the Plaintiff on June 5, and perhaps the morning of June 6.

The inmate log reflects signatures, which in large part can not be read and are confusingly recorded out of sequence. Nevertheless, without question Plaintiff was seen by both prison officials and medical staff (MTAs) from June 5 to 7, as follows: June 5, a "Doctor Call" (DR) sign in 22:30 and sign out 23:00; June 6 there were numerous official visitations throughout the day and DR sign in 12:00 and sign out 12:15, sign in 13:10 and sign out 14:05, sign in 16:05 and sign out 16:22, sign in 20:50 and sign out 21:05, sign in 12:00 and sign out 12:15, and sign in 16:15 and sign out 16:30; June 7, a DR sign in 7:50 and

The MTAs,[9] who allegedly dispensed his seizure medication attest that on June 7 and 8, the Plaintiff never complained about having a seizure or dislocated shoulder. On June 7 and 8, Plaintiff was in the hospital being treated on an emergency basis for the dislocated shoulder he allegedly had not complained about to the MTAs. These attestations are meaningless in respect to whether or not the MTAs, who saw the Plaintiff on June 6, ignored his requests for medical treatment. *See* n. 7.

The Court finds that the medical record construed in favor of the Plaintiff supports his claim that Defendants were deliberately indifferent to his serious medical need for treatment of his dislocated shoulder. Leaving aside for now the Plaintiff's allegations that he told Defendants he was going to have a seizure and they ignored his pleas for help and that they continued to ignore him during the seizure, the medical record reflects that medical staff knew shortly after the seizure that he was seriously injured with a dislocated shoulder. They refused his request for emergency treatment, and told him he would be seen the next morning by the yard RN. He was not seen the next day, except by MTAs, from whom he, unsuccessfully, sought assistance. Even after he filled out a Request for Health Care Service form at 9:00 p.m. on June 6, 2006, it was June 7, 2006, at 11:00 a.m. before Defendants finally referred him to the emergency care he arguably needed at 10:41 p.m. on June 5, 2006.

The Court finds that there are material issues of fact in dispute, which prevent summary judgment from being granted for Defendants Tomlin, Kee, Garcia, Rubacalaba, Poblete, Reynoso, Campos, Gonzales, and Morales.

### Qualified Immunity

A government official is entitled to qualified immunity unless: 1) the plaintiff

---

sign out 8:10, sign in 20:35 and sign out 21:00, and sign in 8:58 and sign out 9:15. Given this evidence the Court will not grant summary judgment because the Plaintiff has given wrong names and confused dates.

[9] Defendants refer to themselves as LVNs.

1  alleges facts that show a constitutional violation, and 2) it was clearly established at the
2  time that the conduct was unconstitutional.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A
3  government official is shielded from damages liability unless his conduct violates clearly
4  established law which a reasonable official in the defendant's position would have
5  known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity entitles
6  prison officials "ample room for mistaken judgments by protecting all but the plainly
7  incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224,
8  229 (1991).

9  Plaintiff alleges Defendants intentionally and deliberately violated clearly
10 established constitutional rights.  *See supra* pp. 3-9 (retaliation claim); supra pp. 9-12
11 (Eighth Amendment claim of deliberate indifference).  There are material facts in dispute
12 regarding these alleged constitutional violations.   Qualified immunity will not protect
13 these Defendants if Plaintiff prevails at trial on his claim of retaliation and/or his claim of
14 deliberate indifference.

15 **Accordingly,**
16
17 **IT IS ORDERED** that the Motion for Summary Judgment (document 99) is
18 DENIED, except in the part granted by the Court on May 6, 2009.
19 **IT IS FURTHER ORDERED** that all other pending motions are DENIED.
20 **IT IS FURTHER ORDERED** that as to Defendants' request that this Court
21 reaffirm its grant of summary judgment based on *Balisok*, the Court shall do so or not,
22 pending supplemental briefing as follows: 1) Defendants shall file a Response to
23 Plaintiff's Sur-Reply within 20 days of the filing date of this Order, which shall be limited
24 to establishing the facts necessary for *Balisok* to apply in this case; 2) Plaintiff shall have
25 20 days to file a Reply to *Balisok*, which shall be so captioned.
26 **IT IS FURTHER ORDERED** that the Clerk of the Court shall refer this case to a
27 Settlement Conference and provide a copy of this Order by email to Sue Jane Younger at
28

1  syounger@caed.uscourts.gov.  The Defendants shall provide a status report, with this
2  Court regarding the date set for the Settlement Conference, any continuances, and its
3  ultimate conclusion.

4       DATED this 30th day of September, 2009.

                                David C. Bury
                              United States District Judge